IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL H.,[1]                          )
                                        )
                Plaintiff,              )
                                        )
vs.                                     )    Civil No. 18-cv-2126-DGW[2]
                                        )
COMMISSIONER OF SOCIAL                  )
SECURITY,                               )
                                        )
                Defendant.              )

## MEMORANDUM and ORDER

## WILKERSON, Magistrate Judge:

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the

final agency decision denying his application for Disability Insurance Benefits (DIB)

pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in June 2015, alleging a disability onset date of

February 21, 2012.   After holding an evidentiary hearing, an ALJ denied the

application on November 22, 2017.   (Tr. 22-31).   The Appeals Council denied

plaintiff's request for review, making the ALJ's decision the final agency decision

subject to judicial review.   (Tr. 1).   Plaintiff exhausted his administrative remedies

and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.
See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties
pursuant to 28 U.S.C. §636(c).   See, Docs. 11, 18.

Plaintiff raises the following issues:

1. The ALJ failed to consider the effects of diabetes, Dr. Cahill's opinion regarding same, and the effects of absenteeism.

2. The ALJ failed to adequately assess Dr. Cahill's opinion.

3. The ALJ's analysis of plaintiff's subjective complaints is not based upon substantial evidence.

4. The ALJ failed to consider the effects of obesity.

5. The ALJ's assessment of Listing 1.02 was insufficient.

6. The ALJ failed to reconcile obvious conflicts between the vocational expert's testimony and the *Dictionary of Occupational Titles* (*DOT*).

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the

2

plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a

rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above.  She first noted that a prior application had been denied by a different ALJ on January 21, 2014 and found no basis to reopen the prior denial.  Therefore, plaintiff is deemed not disabled up to January 21, 2014.

She determined that plaintiff had not worked at the level of substantial gainful activity since January 21, 2014.  He was insured for DIB only through December 31, 2017.  The ALJ found that plaintiff had severe impairments of obesity and cardiomyopathy, which did not meet or equal a listed impairment.[3] She found that his type 2 diabetes and COPD were nonsevere impairments.

The ALJ found that plaintiff had the RFC to do light work, limited to standing for no more than 4 hours in an 8-hour workday; walking for no more than 4 hours in an 8-hour workday; occasional operation of foot controls, balancing, and stooping; no kneeling, crouching, or crawling; no exposure to workplace hazards, humidity, wetness, or extreme temperatures; no operation of commercial motor vehicles; rare climbing of ramps and stairs; and no climbing of ladders, ropes or scaffolds.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work.  However, he was not disabled because

---

[3] Cardiomyopathy "is a disease of the heart muscle that makes it harder for your heart to pump blood to the rest of your body."   https://www.mayoclinic.org/diseases-conditions/cardiomyopathy /symptoms-causes/syc-20370709, visited on October 16, 2019.

he was able to do other jobs that exist in significant numbers in the national economy.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born in 1965 and was 52 years old on the date of the ALJ's decision. (Tr. 266). He said he was disabled because of diabetes, COPD, cardiomyopathy, thick heart walls, high blood pressure, high cholesterol, sleep apnea, acid reflux, dysfunction of left knee, and obesity. He was 5' 10" tall and weighed 293 pounds. He stopped working in February 2012. (Tr. 271-272). He had past employment as a laborer and a production worker. (Tr. 304).

**2. Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in August 2017. (Tr. 89).

Plaintiff testified that he could not work because of shortness of breath and chest pains. He said he had shortness of breath and chest pain since his first heart attack in July 2011. He said he stopped working after he had a second heart attack on the job. He said he also had pain like "needles" in his foot from diabetes. His diabetes was out of control and his blood sugars were high. Gabapentin helped his foot pain. He took it at night because it caused drowsiness. (Tr. 93-96). He had pain in his left knee. He had surgery to put his knee "back

together" sometime in the past.   (Tr. 99).

A vocational expert (VE) also testified.   The VE testified that a person with plaintiff's RFC assessment could not do plaintiff's past work, but he could do other jobs such as mail clerk, marker, or cashier.   Plaintiff's counsel did not identify any conflicts between the VE's testimony and the *DOT*.   (Tr. 103-104).

### 3.    Relevant Medical Records

Plaintiff received primary health care at Casey Family Medical Center beginning in November 2014.   He was seen by FNP Karen Huddlestun ten times between November 2014 and April 2015.   (Tr. 616-635).   At the first visit, he said that his prior doctor had changed his diabetes medication and his blood sugars had been running high.   He also said he took Hydrocodone for osteoarthritis.   He gave a medical history including heart attack, heart disease, COPD, and left knee surgery in 2011.   He used a Spiriva inhaler once a day.   On exam, his gait was within normal limits and he had no edema.   His lungs were clear with no wheezing.   FNP Huddlestun prescribed a different kind of insulin.   At these visits, plaintiff denied chest pain, shortness of breath, and palpitations.   In January 2015, plaintiff's fasting blood sugars were running 100 to 120.   In April 2015, plaintiff said he checked his blood sugar regularly and it ran in a "good range."   FNP Huddlestun noted several times that his gait was normal, and he had no edema.   Many of the visits were for medication refills.   FNP Huddlestun continued to prescribe Hydrocodone for chronic pain management, and he was seen every 30 days for refills.

FNP Huddlestun saw plaintiff on July 31, 2015 for a refill of Hydrocodone.

He again denied shortness of breath or wheezing. His lungs were clear. There was no edema. (Tr. 666-669).

A pulmonary function study was done in August 2015. Plaintiff was 5' 8" tall and weighed 293 pounds. He smoked a pack of cigarettes a day. The study was interpreted as showing minimal airways obstruction with significant improvement after bronchodilator therapy; the findings were said to be "suggestive of COPD." (Tr. 645-647).

Plaintiff was seen by Dr. Thomas Cahill, a cardiologist, in August 2015. Plaintiff said that he had chest pain off and on. The doctor noted there was some question of whether this was related to a previous stab wound or was anginal pain. Plaintiff said he had exertional shortness of breath with mild to moderate activities. On exam, he had trace edema in the extremities. The assessment included hypertrophic cardiomyopathy with outflow tract obstruction "controlled with meds." Dr. Cahill recommended smoking cessation and exercise consisting of mild to moderate physical activity. He filled out disability paperwork for plaintiff's lawyer. (Tr. 654-658).

FNP Huddlestun saw plaintiff six times between May and October 2015. (Tr. 666-679). On each visit, plaintiff denied chest pain, shortness of breath, and palpitations. Sensory exam was consistently normal. In October, she noted that his diabetes was better controlled than it had been in the past, but still "needs work."

FNP Huddlestun saw plaintiff about eighteen times between November 2015 and June 2017. (Tr. 708-765). On almost all visits, plaintiff denied chest pain,

shortness of breath, and palpitations. Sensory exam was consistently normal. There was no edema. His lungs were clear. She described his Type II diabetes as without complications. In June 2016, he had weaned off Hydrocodone and was having some low back pain with prolonged standing. She prescribed a nonsteroidal anti-inflammatory drug. In August 2016, he had no complaints. In March 2017, she prescribed Gabapentin for chronic pain syndrome. Later that month, he presented with unspecified chest pain and she ordered an electrocardiogram.

In June 2017, FNP Huddlestun filled out disability paperwork for plaintiff. Her office note says that he had COPD with no recent exacerbation, he denied chest pain and shortness of breath, and his diabetes was managed with diet and insulin. He took Gabapentin for arthritis pain. He was "Doing well." Sensory exam was intact. There was no edema. (Tr. 708-709).

Plaintiff continued under Dr. Cahill's care for his cardiac issues. He had a negative cardiolite stress test in March 2016. (Tr. 698). In August 2016, Dr. Cahill noted that he had a history of hypertrophic cardiomyopathy and a catheterization showed normal coronaries. He was "severely overweight" at 298 pounds. On exam, his lungs were clear, and his heartrate was regular with no murmur, gallop or click. There was no edema. Dr. Cahill recommended that he stop smoking. (Tr. 692-695). Dr. Cahill reported to FNP Huddlestun that plaintiff's chronic chest pain was attributable to an old stab wound. He did not have cardiac chest pain. He was "limited by his shortness of breath with exertion, but this is a chronic problem." (Tr. 691).

In February 2017, Dr. Cahill again noted that plaintiff did not have exertional chest pain. His cardiomyopathy was treated with metoprolol combination and he had "done well with this." He weighed 306 pounds. Physical exam was negative. He walked independently. He was to continue on his current treatment plan and try to lose weight. (Tr. 683-689).

### 4. Dr. Cahill's Opinion

Dr. Cahill completed a form entitled Cardiac Medical Source Statement in August 2017. (Tr. 650-653). His handwriting is difficult to read, but he listed hypertrophic cardiomyopathy among the diagnoses. Relevant test results included the August 2015 pulmonary function study which he said showed moderate airway obstruction. Plaintiff's symptoms included anginal equivalent pain, exertional dyspnea, and palpitations. He had angina which caused left and right sided chest pain. He was limited to standing/walking less than 2 hours per day and sitting for 4 hours. He had to elevate his legs for 25% of the day because of swelling and tingling. Question 14 asked the doctor to describe "other limitations." Dr. Cahill answered, in part, diabetes, possible peripheral neuropathy, and COPD.

## Analysis

Plaintiff's first two points concern Dr. Cahill's opinion.

Dr. Cahill treated plaintiff, but the ALJ was not required to fully credit his opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and

is not inconsistent with other substantial evidence in the record.   *Brown v. Colvin*,

845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th

Cir. 2000).

Plaintiff's application was filed before March 27, 2017.   The applicable

regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it

applying the factors set forth in § 404.1527(c)(1)-(6).   Supportability and

consistency are two important factors to be considered in weighing medical

opinions.   In a nutshell, "[t]he regulations state that an ALJ must give a treating

physician's opinion controlling weight if two conditions are met: (1) the opinion is

supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]'

and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v.*

*Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained that she gave little weight to Dr. Cahill's opinion

because it was inconsistent with the state agency medical consultants who assessed

plaintiff's RFC based on a review of the medical records.   Also, it was inconsistent

with Dr. Cahill's own findings on the August 2015 exam.   The ALJ pointed out that

Dr. Cahill found that plaintiff's lungs were clear, and the exam was mostly normal except for trace edema and a II/VI systolic ejection murmur. (Tr. 28).

A few paragraphs earlier, the ALJ made relevant observations about the medical records.[4] She noted that plaintiff denied shortness of breath, wheezing, and chest pain at visits with FNP Huddlestun in July, August, and October 2015, and the physical exams were normal. The same was true of visits in May and June 2016, and plaintiff had no complaints at a visit in August 2016. Dr. Cahill reported to FNP Huddlestun in August 2016 that plaintiff's chest pain was attributable to an old stab wound and he was not having cardiac chest pain. And, plaintiff again denied chest pain and shortness of breath to FNP Huddlestun in June 2017. (Tr. 27-28).

Plaintiff's argument ignores much of the ALJ's discussion. Zeroing in on the reference to diabetes in Dr. Cahill's report, he argues that the ALJ "failed to include an adequate restriction related to diabetes in the RFC." Doc. 27, p. 5. Plaintiff discusses *possible* complications of diabetes in his brief, but points to no medical evidence that he suffers from any of those complications. This is not surprising, as the medical records contain no such evidence. On the contrary, FNP Huddlestun, who treated plaintiff's diabetes, repeatedly described it as being without complications.

Plaintiff also argues generally that the ALJ erred in not affording more weight to Dr. Cahill's explanation. However, as the ALJ explained, Dr. Cahill's opinion was inconsistent with the opinions of the state agency consultants and with his own

---

[4] The ALJ's decision should be read as a whole. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

11

treatment notes, both at the time of the report and later.

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ easily met the minimal articulation standard here.

Plaintff suggests that the ALJ failed to discuss absenteeism, as demonstrated by his numerous medical appointments. That argument fails because it assumes that plaintiff would miss a whole day of work every time he had to go to the doctor and that medical appointments could not have been scheduled around his work schedule. Further, plaintiff had to see FNP Huddlestun every 30 days for refills while he was taking Hydrocodone, but the frequency of his visits dropped after he stopped taking that drug.

Plaintiff challenges the ALJ's finding that his subjective complaints were not supported by the record. He nitpicks at the ALJ's analysis, complaining that the ALJ used boilerplate language and did not give him enough credit for his strong work history. Again, he ignores the meat of the ALJ's reasoning, which is that plaintiff's subjective claims are inconsistent with the rest of the evidence. See, Tr. 26.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that

symptom evaluation is "not an examination of an individual's character."   SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529.   *Ibid.*, at \*10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms.   Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).   However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

As required by § 404.1529 and SSR 16-3p, the ALJ considered the objective medical evidence; the course of treatment; the findings of the various doctors on physical exams; plaintiff's own statements to his treating doctors; his daily activities; and the medical opinions.   Contrary to plaintiff's suggestion, the ALJ did not equate his daily activities with an ability to work full-time.   Plaintiff has not identified any error in the ALJ's analysis.   The ALJ's conclusion as to the accuracy of plaintiff's statements was supported by the evidence and was not "patently wrong;" it must therefore be upheld.   *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th

Cir. 2007).

Plaintiff next argues that the ALJ failed to consider the effects of obesity. However, plaintiff himself fails to identify any additional limitation caused by his weight. He notes his own testimony that he has trouble breathing with "any activity" and suffers from incessant foot pain caused by diabetes. Doc. 27, p. 21. However, the ALJ was not required to believe plaintiff's testimony and he points to no medical evidence substantiating his claims. The medical records contain no complaints of foot pain and no diagnoses of complications from diabetes.

Obesity is not, itself, a listed impairment, but the agency has recognized that "Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems." SSR 02-1p, 2000 WL 628049, *3. Of course, this does not mean that an obese person will necessarily have other impairments or is disabled. However, the ALJ is required to consider and explain the effects of obesity. "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p, 2000 WL 628049, *7.

The ALJ found that obesity was a severe impairment and cited SSR 02-1p. (Tr. 25). She gave some weight to the state agency consultants' opinions, and they noted his height and weight and body mass index in their opinions. (Tr. 148, 153, 159, 162). Therefore, consideration of the effects of obesity was factored into the ALJ's decision. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Plaintiff argues that the ALJ erred in evaluating whether he met the requirements of Listing 1.02 in that she did not properly analyze whether plaintiff

14

was able to ambulate effectively.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20 C.F.R. §404.1525(d).   The claimant bears the burden of proving that he meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The 1.00 series of the Listings covers musculoskeletal system disorders.   As is relevant here, Listing 1.02 requires:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> . . . .

Plaintiff's argument never gets off the ground because he points to no evidence establishing that he has major dysfunction of a joint in the first place.   He cites his left knee surgery in 2011, but that was long before the relevant onset date of January 1, 2014.   The record does not even establish the nature of the surgery. The medical records do not contain any imaging studies showing any abnormality of the knee as required by the Listing, no notes of examination of the knee, and no notes of limitation of movement of the knee.   Further, FPN Huddlestun observed

he had a normal gait and Dr. Cahill observed that he walked independently. Plaintiff has failed to carry his burden to demonstrate that he met the requirements of Listing 1.02.

Lastly, plaintiff argues that the ALJ erred at step five because the VE's testimony conflicted with information in the *DOT*.

In making the step 5 determination, the ALJ generally relies on the *DOT* for information about the typical characteristics of jobs as they exist in the economy.[5] An ALJ is required to take administrative notice of job information contained in various publications, including the *DOT*, published by the Department of Labor. See, 20 C.F.R. § 404.1566(d)(1). The ALJ often also relies on testimony from a VE to "supplement the information provided in the *DOT* by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." *Weatherbee v. Astrue,* 649 F.3d 565, 569 (7th Cir. 2011).

When a VE testifies, the ALJ is required to ask the VE whether there are any conflicts between her testimony and the information in the *DOT*; if so, the ALJ must resolve those conflicts. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). The ALJ asked the VE about conflicts here, and none were identified.

Plaintiff's counsel did not point out any conflict between the VE's testimony and the *DOT* at the evidentiary hearing.[6] Therefore, in this Court, plaintiff "now

---

[5]The agency is developing a replacement for the DOT, referred to as the "Occupational Information System." This system will be the "primary source of occupational information SSA staff use in our disability adjudication process." This system is projected to be implemented in 2020. https://www.ssa.gov/disabilityresearch/occupational_info_systems.html, visited on October 18, 2019.

[6] Plaintiff is represented by a different attorney in this Court.

has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00–4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the *DOT*." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008), citing *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) [emphasis in original].

The VE testified that plaintiff could do the jobs of Marker (209.587-034), Cashier (211.462-010), and Mail Clerk (209.687-026).   Plaintiff argues that this testimony conflicted with the *DOT* because the Marker job requires walking up to two-thirds of the day and the Cashier job requires standing for more than four hours a day.   He also argues that plaintiff cannot meet the mental demands of Cashier and Mail Clerk because he has only a limited education and is limited to unskilled work, but those jobs require a reasoning level of 3.

It is not at all clear that the alleged conflicts were obvious enough that the ALJ should have picked up on them without any assistance.   However, it is unnecessary to decide that issue because plaintiff has not identified any actual conflict with the *DOT*.

Plaintiff's argument about the physical demands of Marker and Casher is based on information from the *Occupational Outlook Handbook*.   While the *OOH* is a Bureau of Labor Statistics publication, it is not the same as the *DOT*.   SSR 00-4p requires the ALJ to ask about and resolve apparent conflicts between the VE's testimony and information provided in the *DOT*.   SSR 00-4p, 2000 WL 1898704, at *4.   Plaintiff has not identified anything that requires the ALJ to do the same for information contained in the *OOH*.

Plaintiff also fails to identify a conflict between the VE's testimony and the *DOT* regarding the mental demands of Cashier and Mail Clerk. Plaintiff has a limited education, meaning "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. § 404.1564(b)(3). Reasoning level 3 requires a person to "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *DOT* 211.462-010, 1991 WL 671840. A person who is limited to unskilled work is not necessarily incapable of doing jobs with a reasoning level of 3. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

In any event, the Marker job only requires reasoning level 2, "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *DOT* 209.587-034, 1991 WL 671802. Plaintiff does not argue that he is incapable of doing a job at that reasoning level. In fact, both of his past relevant jobs required reasoning level 2. *DOT* 609.685-018, 1991 WL 684915; *DOT* 922.687-058, 1991 WL 688132. The VE testified that there are 452,359 Marker jobs in the national economy (Tr. 103), which is certainly a significant number.

Plaintiff's arguments are little more than an invitation for this Court to

18

reweigh the evidence. He has not identified a sufficient reason to overturn the ALJ's conclusion. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: October 21, 2019.**

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**